## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| METROPCS, a brand of T-MOBILE USA, Inc., a Delaware Corporation | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No: _____ |
| v. | ) ) | |
| FIESTA CELL PHONE & DISH NETWORK, INC., SMBNW ENTERPRISES INC., individually and d/b/a FIESTA CELL PHONES, IRACITI INC. d/b/a CELLULAR PORT, ZAWAR H. SHAH, MOEED H. SHAH a/k/a SYED SHAH a/k/a SEAN SHAH, and JANE DOE 1, | ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | | |

### COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff T-Mobile USA, Inc., a Delaware corporation ("T-Mobile"), for itself and its MetroPCS brand (collectively referred to hereafter as "MetroPCS"), hereby files this Complaint for Damages and Injunctive Relief against Defendants Fiesta Cell Phone & Dish Network, Inc., SMBNW Enterprises Inc., individually and d/b/a Fiesta Cell Phones, Iraciti Inc. d/b/a Cellular Port, Zawar H. Shah, Moeed H. Shah a/k/a Syed Shah a/k/a Sean Shah, and Jane Doe 1 (collectively, "Defendants"), and states:

### INTRODUCTION

1.      T-Mobile sells wireless handsets under the brand MetroPCS ("MetroPCS Handsets" or "Handsets") for use with MetroPCS service on the T-Mobile wireless network. These MetroPCS Handsets are sold at prices significantly below the wholesale cost to MetroPCS so that the Handsets are more widely accessible to consumers.   Defendants and their co-conspirators are perpetrators of an unlawful scheme (the "Handset Theft and Trafficking Scheme"

1

or the "Scheme") to profit, at Plaintiff's expense, from the illegal acquisition and resale of new

MetroPCS Handsets by stealing the substantial financial investments that Plaintiff makes in the

Handsets.

2.      Defendants and their co-conspirators acquire new MetroPCS Handsets through

various methods, including the use of "runners" and/or "mules."[1]  As part of their Scheme, the

new Handsets, which may be purchased and sold multiple times before they are ever used,

ultimately end up in the hands of someone other than a MetroPCS customer.  Along the way, the

Handsets are "unlocked" so they will operate on other wireless networks.  Often the ultimate user

of the phone is located overseas, in a country where the wireless service provider does not

underwrite the cost of new phones.

3.      Defendants' Scheme takes advantage of the fact that while Plaintiff substantially

invests in the Handsets to reduce the costs for legitimate MetroPCS consumers, other wireless

service providers here or abroad do not.  By obtaining the MetroPCS Handsets through theft or

fraud and diverting them to other markets where cell phones are not subsidized, the Scheme

converts Plaintiff's investment dollars into profits for Defendants and their co-conspirators.  Each

of Defendants' acts, individually as well as together, is a violation of Plaintiff's rights and causes

significant damage.  Additionally, as participants in the conspiracy, Defendants are liable for the

harm caused to Plaintiff by the entire Scheme.

4.      The Scheme causes tremendous harm to MetroPCS and to consumers.  In addition

to the pecuniary losses caused by Defendants' theft of Plaintiff's investment in MetroPCS

Handsets, falsely paid commissions, lost sales and market expenses, and lost expected customer

---

[1] A "Runner" is an individual or entity that makes multiple purchases of new MetroPCS Handsets on behalf of phone
traffickers like Defendants.  A "Mule" is an individual or entity that signs up for wireless service with MetroPCS –
never intending to comply with the terms and conditions – to obtain new subsidized MetroPCS Handsets for resale by
phone traffickers like Defendants.

revenue, Defendants' misconduct harms MetroPCS's relationships with its customers, dealers, and others, as detailed more fully below.  Defendants' Scheme also involves unlawfully accessing Plaintiff's protected computer systems and wireless network; trafficking of Plaintiff's protected and confidential computer passwords; and willful infringement of the MetroPCS trademarks. Defendants have caused substantial damage to MetroPCS's brand, image, and reputation.

5.      Plaintiff seeks to recover damages for the harm caused by Defendants' Handset Theft and Trafficking Scheme, and to obtain an injunction prohibiting Defendants from continuing to perpetrate the Scheme.

6.      All conditions precedent to filing this action have been performed, waived or excused.

7.      Plaintiff has retained the undersigned attorneys to represent them in this action and have agreed to pay those attorneys a reasonable fee for their services.

## PARTIES, JURISDICTION, AND VENUE

8.      This is an action for damages in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees.

9.      T-Mobile is a Delaware corporation, with its principal place of business in Bellevue, Washington.

10.     MetroPCS was acquired by T-Mobile USA, Inc. in 2013 and is an exclusive T-Mobile brand.

11.     Defendant Fiesta Cell Phone & Dish Network, Inc. ("Fiesta Cell Phones") is a Texas corporation with its principal place of business at 6855 S. Gessner Road, Houston, Texas 77036.  Upon information and belief, Defendant Zawar Shah is the president and registered agent of Fiesta Cell Phones.

3

12.     Defendant SMBNW Enterprises Inc., individually and d/b/a Fiesta Cell Phones ("SMBNW") is a Texas corporation with its principal place of business at 7457 Harwin Drive, Suite 338, Houston, Texas 77036.  SMBNW also does business at 6855 S. Gessner Road, Houston, Texas 77036.  Upon information and belief, Defendants Zawar Shah and Moeed Shah are principals of Defendant SMBNW.

13.     Defendant Iraciti Inc. d/b/a Cellular Port is a Texas corporation with its principal place of business at 7100 Harwin Drive, Suite A, Houston, Texas 77036.

14.     Defendant Zawar H. Shah ("Z. Shah") is an individual and a citizen of Texas and upon information and belief is personally engaged in and helped facilitate the improper conduct described herein.  Upon information and belief, Z. Shah resides on Ashford Willow, Sugar Land, Texas 77478.

15.     Defendant Moeed H. Shah ("M. Shah") a/k/a Syed Shah a/k/a Sean Shah is an individual and a citizen of Texas and upon information and belief is personally engaged in and helped facilitate the improper conduct described herein.  Upon information and belief, M. Shah resides on Ashford Willow, Sugar Land, Texas 77478.

16.     Upon information and belief, Defendant Jane Doe 1 is an individual and a citizen of Texas and is personally engaged in, and helped facilitate, the improper conduct described herein. Upon information and belief, Defendant Jane Doe 1 works at 6855 S. Gessner Road, Houston, Texas 77036 and is an employee of Defendants Fiesta Cell Phones and/or SMBNW.  Although the exact identity of Defendant Jane Doe 1 is not presently known, upon information and belief she resides in Houston, Texas.  The Complaint will be amended to include the name of Jane Doe 1 when such information becomes available.

17.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338 because Plaintiff's claims for violation of the United States Trademark Act, Title 15 of the United States Code and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*. arise under federal law and because diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of costs, fees, and interest.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

18.     Defendants are subject to the personal jurisdiction of this Court because they are residents of Texas and, upon information and belief, they conduct business ventures within the State of Texas, committed tortious acts within the State of Texas and have engaged in substantial and not isolated activity within the State of Texas.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants either reside in this district or a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PLAINTIFF'S BUSINESS MODEL

20.     T-Mobile, which is based in Bellevue, Washington, is a well-established telecommunications leader in product and service innovation. T-Mobile has invested heavily in developing and maintaining its reputation and the reputation of its brands, including MetroPCS. It prides itself on its advanced nationwide 4G LTE network and low cost options provided for its customers. T-Mobile USA, Inc. provides services through its subsidiaries and operates its flagship

109288442.1

brands, T-Mobile and MetroPCS.  It currently serves approximately 69 million wireless customers and provides products and services through approximately 70,000 total points of distribution.

21.     MetroPCS, acquired by T-Mobile on May 1, 2013, has been in the forefront of telecommunications for decades by offering customers reduced-cost handsets and flat-rate wireless service plans.  MetroPCS prides itself on the value and variety of device choices from leading brands provided to its customers. The cornerstone of MetroPCS's business model is providing customers with affordable, reliable wireless products and services to match their needs and lifestyles.  A flagship brand operated by T-Mobile, MetroPCS products and services are available online and across the United States through a network of company-owned stores and authorized dealer locations, with whom MetroPCS has contractual relationships.

22.     T-Mobile and MetroPCS are widely-recognized leaders in prepaid wireless service and highly value the outstanding business reputation they have worked hard to develop. MetroPCS has been recognized as a J.D. Power Customer Champion  for delivering service excellence after being evaluated across five categories including its people, presentation, process, product and price and T-Mobile again achieved the highest ranking in customer service in J.D. Power's 2015 Wireless Customer Care Full-Service Study for the 13th time.

23.     MetroPCS's wireless program enables MetroPCS customers to choose from several flat-fee monthly voice and data plans for use with cutting edge devices on the T-Mobile wireless network.  For the benefit of its customers, MetroPCS offers budget-friendly Handsets, including the latest smartphones, for little or no upfront cost, no annual service contract, no overages, and no hidden device costs.

24.     MetroPCS's business model is based upon the ability to deliver affordable, innovative, and desirable products and services to cost-conscious consumers.  Therefore, Plaintiff

109288442.1

assists customers in their purchase of MetroPCS Handsets for use on its network by selling the Handsets for less than what Plaintiff pays to the manufacturers for the Handsets. Plaintiff recoups the money it loses on the Handsets and in dealer commissions through revenue earned on the sale of MetroPCS service, which customers must use to transmit and receive voice, text, and data on the MetroPCS Handsets. In addition to subsidizing Handsets, MetroPCS provides discounts, rebates, and other incentive programs by which Plaintiff heavily invests in the Handsets to the ultimate benefit of legitimate MetroPCS customers. This investment is worth making if the customers pay for service on the MetroPCS network in accordance with the governing Terms and Conditions. MetroPCS is neither a manufacturer nor a wholesale distributor of Handsets. If MetroPCS was in the business of selling Handsets and not a telecommunications service provider, it could not offer consumers these significantly lower purchase prices and stay in business. Further, these types of substantial subsidies and investment programs are not offered by telecommunications carriers outside the United States; instead, foreign consumers pay full price for the phones from the manufacturers. Handset traffickers profit from the difference between the full value of the Handset and the subsidized price offered by MetroPCS.

25.     MetroPCS Handsets are sold subject to terms and conditions ("Terms and Conditions") which restrict and limit the commercial resale and use of the Handsets. A copy of the Terms and Conditions is attached hereto as **Exhibit A**. The packaging of MetroPCS Handset provides that by purchasing or opening the package, activating, using, or paying for MetroPCS service, the purchaser agrees to the MetroPCS Terms and Conditions posted on www.metropcs.com. Purchasers have the option to return the MetroPCS Handset in accordance with the return policy if they do not agree to the Terms and Conditions. The Terms and Conditions

are legally valid and appropriate, and the Terms and Conditions constitute a valid and binding contract between MetroPCS and each of its customers.

26.     MetroPCS is able to offer its Handsets to customers at reduced prices only if the Handsets are used as intended with MetroPCS service.  Manufacturers that produce wireless phones for MetroPCS install proprietary software, requested and paid for by Plaintiff, on the MetroPCS Handsets.  Among other things, this software is intended to prevent the Handsets from being used for other than MetroPCS service, except under circumstance in which legitimate customers meet the criteria to have the Handset unlocked.

27.     Wireless technology is constantly changing and improving, and the wireless industry is intensely competitive.  MetroPCS expends substantial resources to maintain its position as an industry leader and to ensure that its products and services are at the cutting edge of the latest technological developments.  Providing its cost-conscious customers with quality and advanced technology at an affordable price is a key differentiator for MetroPCS and central to its business strategy.

28.     Plaintiff invests heavily in efforts to provide MetroPCS customers with the most up-to-date wireless handsets, and shoulders most or all of the cost of purchasing a new phone for those customers.  MetroPCS makes phones available to new customers at a low cost when they initiate wireless service, and also to existing customers at regular intervals.

29.     As the demand, and therefore the price, for smartphones in various world markets skyrockets, the subsidized MetroPCS smartphones are a particularly attractive and lucrative target for participants in the Handset Theft and Trafficking Scheme.

## METROPCS TRADEMARK RIGHTS

30.     T-Mobile owns federal trademark registrations for the standard character and stylized MetroPCS® mark (collectively, the "MetroPCS Marks").  Copies of the certificates of registration issued by the United States Patent and Trademark Office ("USPTO") are attached hereto as **Composite Exhibit B**.[2]  The stylized MetroPCS Marks are depicted below:

   

31.     Plaintiff uses the MetroPCS Marks on and in connection with telecommunications products and services.

32.     The MetroPCS Marks have become an intrinsic and essential part of the valuable goodwill and property of Plaintiff, who protects the MetroPCS Marks.  The MetroPCS Marks are well-established and well-known to customers and the trade as a symbol identifying and distinguishing MetroPCS products and services, and signifying distinctive products and services of high quality.  Only Plaintiff and its expressly authorized, affiliated agents are permitted to use the MetroPCS Marks.  The MetroPCS Marks are valid, distinctive, protectable, have acquired secondary meaning, and are associated exclusively with Plaintiff and MetroPCS.

## DEFENDANTS' MISCONDUCT

33.     MetroPCS has discovered that, although large quantities of its Handsets are being acquired throughout the United States, a significant number of these Handsets are not being used in connection with its services.  Instead, entities and individuals such as Defendants and their co-

---

[2] On or around November 3, 2006, MetroPCS, Inc. assigned all of its MetroPCS Marks to MetroPCS Wireless, Inc. as part of a merger agreement.  The assignment was recorded with the USPTO on April 3, 2007. On or around May 1, 2013 MetroPCS Wireless, Inc. assigned all of its MetroPCS Marks to T-Mobile USA, Inc. as part of a merger agreement.  The assignment was recorded with the USPTO on May 2, 2013.

109288442.1

conspirators, with no intention of lawfully connecting to or using MetroPCS services, are fraudulently acquiring and reselling MetroPCS Handsets in bulk quantities. The Handsets are acquired, either directly by Defendants or through their co-conspirators, and then sold for a substantial profit and shipped directly overseas or shipped to other domestic traffickers who add them to larger shipments headed overseas, to be used on foreign carriers' networks. Before being shipped overseas, the Handsets are usually taken out of their original packaging, and all accessories, warranties, and manuals are removed. The Handsets are often wrongfully unlocked by Defendants or their co-conspirators, to raise their value and prepare them for use on foreign carriers. Those new MetroPCS Handsets acquired through theft or fraud that are not shipped overseas are often sold in bulk domestically for inclusion in larger overseas shipments or for the warranty market. Defendants undertake these actions for their own profit.

34. Once a MetroPCS Handset is unlocked and shipped overseas or resold domestically to be used on other wireless networks, Plaintiff no longer has a revenue source to recoup its investment in that Handset.

35. If MetroPCS identifies a Handset as connected with theft, fraud, or other loss, the International Mobile Station Equipment Identity ("IMEI") is logged into MetroPCS's system and the Handset can no longer be activated or used on the MetroPCS network unless or until that designation is changed by MetroPCS. This is done in attempt to deter criminal activity. The Handset is thereafter referred to in the handset trafficking community as having a "Bad IMEI." As it is no longer a functioning MetroPCS Handset, the only value of a Bad IMEI Handset is in unlocking the handset for use on other domestic networks and for overseas resale.

36. Defendants are knowingly and willfully engaged in an enterprise that traffics in and resells MetroPCS Handsets. Defendants have acquired and sold large quantities of MetroPCS

Handsets through various co-conspirators.  While the complete extent of Defendants' activities in the Handset Theft and Trafficking Scheme is not yet known, Defendants are actively involved in several integral components of the conspiracy.

37.     Defendants are not authorized MetroPCS dealers.  Defendants have no legitimate connection to MetroPCS.

38.     MetroPCS identified Defendants as handset traffickers in or around July 2016 through Defendants' online solicitation of new MetroPCS Handsets posted on Wireless Dealers. Samples of Defendants' ads are attached as Composite **Exhibit C**.  The ads identify the buyer as Defendant SMBNW, with an email address of mortalwireless@gmail.com— the name associated with this address is "Syed Shah," who is, upon information and belief, Defendant M. Shah.

39.     In response to Defendants' advertisement, on July 28, 2016, an investigator for MetroPCS contacted SMBNW via the provided email address to inquire if they were still interested in buying phones.  M. Shah replied and indicated that he was interested in purchasing new MetroPCS Handsets and wanted to conduct an initial transaction for 100 new MetroPCS LG K7 Handsets.  Copies of the email messages with Defendant M. Shah are attached hereto as **Exhibit D**.  M. Shah confirmed that his company is Defendant SMBNW.  *Id*.

40.     During this initial email exchange, Defendant M. Shah confirmed that the MetroPCS Handsets he was purchasing on behalf of Defendants must be new.  *Id*.  M. Shah and the investigator agreed to complete a sample transaction of 10-15 phones and M. Shah was adamant that he would still want to fulfil the order for 100 new phones.  *Id*.  Simultaneously, M. Shah also began talking about a second transaction for new MetroPCS Samsung Core Prime Handsets.  *Id*.

41.     On August 1, 2016, M. Shah and the investigator continued to communicate over What's App to solidify the details of the initial sample transaction.   Copies of the What's App message exchanges with Defendant M. Shah are attached hereto as **Exhibit E**.  M. Shah advised the investigator that he wanted the phones delivered to Fiesta Cell Phones located at 6855 South Gessner Drive, Houston, Texas 77036, where he would pay cash for the sample of 10 MetroPCS LG K7 Handsets.  *Id*.

42.     During the conversation, M. Shah boasted about his 14 years in the handset trafficking business and repeatedly asked the investigator when he would receive the balance of his initial demand for 100 new Handsets because he had a "direct buyer" already set up; he also inquired how many more phones, on top of the first 100, the investigator could supply.  *Id*.

43.     On August 3, 2016, an investigator traveled to Defendants' store, Fiesta Cell Phones at 6855 South Gessner Drive, Houston, Texas 7703, to complete the sample transaction; SMBNW also conducts business at this location. When the investigator arrived and asked for M. Shah, Jane Doe 1 greeted him and initially feigned ignorance as to M. Shah.  However, after the investigator explained that he was there for a scheduled appointment to sell phones to M. Shah, Jane Doe 1 immediately made a phone call and advised the investigator that M. Shah was on route to the store; she asked the investigator to wait.

44.     Shortly thereafter, Jane Doe 1 received a call and asked the investigator to speak with the caller.  The caller explained that the appointment was made by his son, M. Shah who would not be able to meet until much later in the day.  Instead, the caller asked that the investigator complete the transaction with Jane Doe 1 in the store and that she would pay the agreed amount of $400 for 10 MetroPCS LG K7 Handsets.  A copy of the paid invoice is attached as **Exhibit F**. Upon information and belief the caller was Z. Shah, M. Shah's father and business partner.

12

45.     MetroPCS's investigation of the post-sale history of the Handsets sold to Defendants confirmed that at least seven of the 10 new MetroPCS Handsets were never activated on the MetroPCS wireless network.  On information and belief, three of the new Handsets were unlocked and resold domestically and seven new Handsets were resold and shipped overseas, unlocked or to be unlocked, and used on a network other than MetroPCS.

46.     On August 4, 2016, M. Shah continued to communicate with the investigator confirming the business address for SMBNW (6855 South Gessner Drive, Houston, Texas 7703) and his email address at moeed74@gmail.com.  *See* **Exhibit E**.  In this message, M. Shah identifies himself with another one of his aliases, "Sean Shah."  *Id*.  M. Shah was now asking that the investigator immediately prepare an invoice for the sale of 200 Handsets: 100 MetroPCS LG K7 Handsets and 100 MetroPCS Samsung On5 Handsets that S. Shah wanted to purchase.  *Id*.

47.     On August 15th, after the investigator did not complete the requested transaction for 200 new MetroPCS Handsets, M. Shah stated that "I need stock, please don't go anywhere this time," and asked for prices on various models including MetroPCS LG K7, LG K4, and LG K3 Handsets as well as Samsung On5 Handsets, and urging the investigator to "invoice me today." *See* **Exhibit E**.

48.     Later that day, M. Shah stressed the urgency of obtaining these handsets explaining to the investigator that "[w]e have to do about 1000 phones per week.  At least."  *Id*.  M. Shah admitted that the Handsets will be resold both overseas and domestically.  *Id*.

49.     Because M. Shah failed to attend the August 3rd meeting, the investigator explained that he was hesitant to engage in additional, large scale transactions with Defendants without checking Defendants' references.  *See* **Exhibit E**.  In response, M. Shah stated that he would travel to Philadelphia to meet the investigator in person to allay any concerns.  *Id*.  Over the next several

days M. Shah continued to communicate with the investigator asking for prices on various MetroPCS Handset models and confirming that "I have big orders that I could give you." *Id.*

50.      On August 19, 2016, M. Shah arrived in Philadelphia to meet the investigator to discuss getting into business together to traffic Handsets on a large scale. *Id.* They met at Defendant's hotel and traveled together to a MetroPCS store to discuss their business plan. *Id.* M. Shah reiterated his need for a weekly supply of 1,000 Handsets and indicated that he unlocks the phones and they are exported.

51.      Following their in-person meeting, on August 22nd, M. Shah texted the investigator to get their large scale business going and once again reiterating that he will buy all of the phones he can get. A copy of the text messages with M. Shah is attached as **Exhibit G**.

52.       In order to facilitate the future shipments of phones, M. Shah provided the investigator with Defendants' FedEx account number. *Id.* At Defendants' request, on August 24th, the investigator shipped Defendants an additional 20 new MetroPCS Handsets: 20 LG K7 Handsets, 5 Samsung Grand Prime Handsets, and 5 Samsung Core Prime Handsets. *Id.* M. Shah directed the investigator to ship the Handsets to Defendants at SMBNW Enterprises Inc., 6855 South Gessner Road, Houston, Texas 77036. *Id.*

53.      MetroPCS's investigation of the post-sale history of these Handsets sold to Defendants confirmed that at least 19 of the 20 new MetroPCS Handsets were never activated on the MetroPCS wireless network.  On information and belief, one of the new Handsets was unlocked and resold domestically and the other 19 new Handsets were resold and shipped overseas, unlocked or to be unlocked, and used on a network other than MetroPCS.

54.      The investigator later communicated with M. Shah about coming to Houston to see Defendants' facilities, to which M. Shah agreed and told the investigator to meet him at

Defendants' warehouse located at 7100 Harwin Drive, Houston, Texas 77036.  *See* **Exhibit G**. This location is the business address for Defendant Cellular Port.

55.     On August 30, 2016, the investigator arrived at Cellular Port and, upon asking for M. Shah, the woman at the desk feigned ignorance of him, just as the woman at Fiesta Cell Phones had done previously.  Shortly thereafter, M. Shah arrived with Z. Shah, his father and business partner.  Defendants toured the facility with the investigator, which includes a retail store in the front and offices and a large warehouse, stocked with thousands of cellular phones, in the rear.  Z. Shah stated that he has been in the cell phone business for 20 years and that he was helping his son, M. Shah to get more involved in the business.  Z. Shah confirmed that the new handsets they purchase in bulk are shipped primarily to Dubai and Nigeria, where Defendants' buyers unlock the handsets for use on foreign carriers.

56.     During this meeting, Defendants paid the investigator cash for the 20 new MetroPCS Handsets that the investigator shipped to Defendants.  Defendants confirmed that they would pay cash in all future transactions, no matter how large.

57.     Thereafter, M. Shah continued to contact the investigator repeatedly asking when he would receive the first full shipment of Handsets.  *See* **Exhibit G**.

58.     On information and belief, when Defendants did not obtain new MetroPCS Handsets from the investigator, Defendants found another supplier to meet their buyers' demands, including a minimum of 1,000 new MetroPCS Handsets per week, all of which are unlocked and either resold domestically for use on networks other than MetroPCS, or shipped overseas by Defendants or their co-conspirators for their own profit and to MetroPCS's detriment.

109288442.1

### SUBSTANTIAL HARM CAUSED BY DEFENDANTS' MISCONDUCT

59.     Defendants' actions substantially harm Plaintiff in several ways, including *inter alia*: (1) Plaintiff is deprived of the opportunity to recoup its substantial investment in MetroPCS Handsets; (2) Plaintiff is deprived of the opportunity to earn profits by providing wireless service to legitimate MetroPCS consumers; (3) Defendants' actions seriously and irreparably interfere with Plaintiff's relationships with its customers and dealers; and (4) Defendants' infringement of the MetroPCS name and Marks causes significant ongoing and irreparable losses and harm to MetroPCS's brand, image, and reputation.  All of these factors undermine Plaintiff's competitive edge in the wireless industry.

60.     On information and belief, the conduct of Defendants, their unknown co-conspirators, and others who engage in the unlawful acquisition and resale of large quantities of new MetroPCS Handsets has also resulted in shortages of available MetroPCS Handsets, particularly the most in-demand models.  This misconduct substantially harms Plaintiff and its relationship with dealers and consumers because Plaintiff is not able to supply sufficient MetroPCS Handsets to satisfy the demand from legitimate consumers who, as a result, go elsewhere for their telecommunications services.

61.     Plaintiff suffers additional, irreparable harm when the MetroPCS Handsets are removed from the original packaging and altered because Plaintiff is deprived of the means to control the quality of its product.  This becomes especially damaging where a potential legitimate MetroPCS customer within the United States acquires a Handset from Defendants that the customer believes is a genuine MetroPCS Handset, with all of the attendant benefits and is later disappointed in MetroPCS because the Handset does not work as intended on the network because it has been denominated a Bad IMEI Handset or otherwise.  Furthermore, the process of unlocking

16

and reselling a MetroPCS Handset voids the manufacturer's warranty on the device.  The unlocked repackaged MetroPCS Handsets are then resold without the original manufacturer's warranty documentation.  Both consumers and Plaintiff are harmed when a MetroPCS Handset that has been altered or sold by Defendants or their co-conspirators is submitted for warranty repair.  Consumers who purchase MetroPCS Handsets from Defendants or their co-conspirators are unable to obtain warranty service in the event they experience problems with their Handsets.  As a result, the MetroPCS reputation suffers .

62.     MetroPCS's reputation is further damaged by its inability to assist those consumers who buy MetroPCS Handsets from Defendants, because despite bearing the MetroPCS Mark, they are no longer valid MetroPCS Handsets because the actions of Defendants and their co-conspirators voided the warranties and/or as identified Bad IMEI phones, they cannot be activated on MetroPCS service.

63.     Defendants' conduct has resulted in substantial harm to Plaintiff's business reputation and goodwill; a greater likelihood of confusion, mistake, and deception as to the source of origin of MetroPCS products unlawfully sold by the Defendants and confusion as to what if any relationship exists between Plaintiff and Defendants.

## CIVIL LITIGATION AGAINST OTHER PHONE TRAFFICKERS

64.     Federal courts have recognized that conduct similar to Defendants' conduct is unlawful.

65.     In addition to MetroPCS and T-Mobile USA, Inc., Sprint Solutions, Inc. and Sprint Communications Company L.P. ("Sprint), TracFone Wireless, Inc., Nokia Corporation, and AT&T Mobility LLC have all filed lawsuits in numerous federal courts across the country against handset traffickers engaged in the practice of defrauding legitimate consumers and the

telecommunications companies by acquiring large quantities of wireless telephones and reselling them for profit.   Each of those companies has succeeded in obtaining Final Judgments and Permanent Injunctions.  Copies of several examples of Final Judgments and Permanent Injunctions are attached hereto as **Composite Exhibit H**.  A defendant in one case who continued trafficking in phones in violation of an injunction issued by the U.S. District Court for the Southern District of Texas was charged with criminal contempt of court and sentenced to serve 57 months in prison. Copies of the Memorandum Opinion and Order of Contempt, Application for Criminal Contempt, the Order finding cause to believe the defendant is guilty of criminal contempt, and Judgment of Criminal Contempt are attached hereto as **Composite Exhibit I**.

**CRIMINAL INVESTIGATION AND
PROSECUTION OF PHONE TRAFFICKING**

66.     Handset traffickers like Defendants have been the subject of numerous criminal investigations and prosecutions across the country.  Some recent examples are:

a.     In August 2014, the United States Attorney for the District of Minnesota announced the indictment of 20 individuals engaged in the illegal acquisition and resale of tens of thousands of Smartphones to the black markets of the Middle East and China.  A joint task force comprised of the U.S. Secret Service, the Minnesota Financial Crimes Task Force, and the St. Paul Police Department investigated and then apprehended members of the "Mustafa Organization," who had been using runners, engaged in contract and subscription fraud, and robbery to acquire large quantities of subsidized phones for overseas resale.

b.     In March, 2013 the California Attorney General charged two individuals with trafficking nearly $4 million in wireless phones to Hong Kong over an 8 month period.

18

c.      On or about February 25, 2013, federal law enforcement authorities, including
agents from the Federal Bureau of Investigation, the United States Secret Service,
and the Bureau of Alcohol, Tobacco, Firearms and Explosives, raided a warehouse
belonging to a phone trafficking company called Wireless Buybacks in Elkridge,
Maryland, pursuant to a search warrant and found the facilities were being used to
harbor stolen wireless phones.

d.      On August 21, 2012, federal Homeland Security agents and SWAT teams
conducted a raid on facilities operated by handset trafficker Ace Wholesale and on
the home of the company's CEO, Jason Floarea.  On October 16, 2014, Mr. Floarea
pled guilty to Interstate Transportation of Stolen Property and on April 16, 2015,
Floarea was sentenced to twelve (12) months and one day in federal prison.

e.      An FBI sting operation in Philadelphia that began with wireless phone trafficking
resulted in the conviction of 16 individuals on terrorism charges, when it turned out
that the proceeds from their phone trafficking and other illegal conduct was being
funneled to the terrorist organization Hezbollah.

Copies of court documents, press releases, and news reports regarding these incidents are attached
hereto as **Composite Exhibit J.**

## COUNT ONE

### UNFAIR COMPETITION

67.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as
though fully set forth herein.

68.     Defendants' conduct in acquiring and/or inducing others to acquire the Handsets,
disabling or unlocking, inducing others to disable or unlock, and/or assisting others to disable or

19

109288442.1

unlock the Handsets, and reselling and/or assisting others to resell the Handsets as new for activation on other wireless networks constitutes unfair competition under the common law of the State of Texas.

69.     Defendants' conduct in selling, inducing others to sell, and/or conspiring with others to sell unlocked MetroPCS Handsets undermines Plaintiff's incentive programs, illegally appropriates Plaintiff's investment in the Handsets, and constitutes unfair competition under the common law of the State of Texas.

70.     Defendants' use of at least one of the MetroPCS Marks in connection with the sale of unlocked, materially-different MetroPCS Handsets has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' materially-different products and services, and the relationship between MetroPCS and Defendants.  Thus, Defendants have also engaged in unfair competition with Plaintiff in violation of the common law of the State of Texas by selling and/or offering, and promoting their products with the intention of trading upon the goodwill established by MetroPCS and are thereby misappropriating the benefits of substantial effort and money expended by Plaintiff in establishing its rights in and to the MetroPCS Mark.

71.     Defendants' actions were done in bad faith; they were intentional, malicious, and willful, and have caused substantial harm to Plaintiff.

72.     Plaintiff is entitled to appropriate relief, including injunctive relief.

## COUNT TWO

### TORTIOUS INTERFERENCE
### WITH BUSINESS RELATIONS

73.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

109288442.1

74.     A business relationship, and an expectancy of business relationships, exists between Plaintiff and authorized dealers of MetroPCS Handsets.

75.     A business relationship, and an expectancy of business relationships, exists between Plaintiff and current and prospective MetroPCS customers.

76.     There is a high probability of future economic benefit to Plaintiff as a result of these current and prospective business relationships.

77.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these current and prospective business relationships between Plaintiff and authorized dealers who sell MetroPCS products, and legitimate MetroPCS customers or prospective customers.

78.     Specifically, but without limitation, Defendants knew that Plaintiff has business relationships, and an expectancy of business relationships, with legitimate consumers of MetroPCS Handsets and wireless service.  Defendants interfered with these relationships by engaging in the Handset Theft and Trafficking Scheme and causing, at least in part, Plaintiff to have an insufficient supply of MetroPCS Handsets available to meet legitimate consumer demand.

79.     Defendants also knew that Plaintiff has business relationships with authorized dealers of MetroPCS Handsets to provide said dealers with sufficient quantities of MetroPCS Handsets for their legitimate consumers' use exclusively on MetroPCS's wireless network. Defendants' Scheme has resulted in significant numbers of new MetroPCS Handsets that are diverted from service on MetroPCS, causing Handset shortages and thereby harming Plaintiff's relationship with its authorized dealers.

80.     Defendants also knew that Plaintiff has business relationships with legitimate MetroPCS customers to provide them with Handsets and MetroPCS service.

81.     Defendants are intentionally interfering with Plaintiff's business relationships and prospective advantages through improper means and in violation of the law.

82.     Defendants engaged in the acts of interference set forth herein with a conscious desire to prevent the relationships from occurring or continuing, or Defendants knew that the interference was certain or substantially certain to occur as a result of their conduct.

83.     As set forth fully below, Defendants' intentional interference was committed through the use of fraud and fraudulent misrepresentations to Defendants' direct benefit and to the detriment of Plaintiff.

84.     Defendants' acts injured Plaintiff's business relationships.

85.     Plaintiff has been proximately damaged and continues to be damaged as a result of Defendants' interference.

86.     There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' tortious interference.

## COUNT THREE

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

87.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

88.     A contractual relationship exists between Plaintiff and authorized dealers of MetroPCS Handsets.

89.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these contracts between Plaintiff and its authorized dealers.

109288442.1

90.     Defendants also knew that Plaintiff has contractual relationships with authorized dealers of MetroPCS Handsets under which these dealers will promote and sell MetroPCS products solely for activation with MetroPCS service.  On information and belief, Defendants and/or their co-conspirators induce authorized MetroPCS dealers to breach their agreements with MetroPCS and provide new MetroPCS Handsets to Defendants for a purpose other than activation on MetroPCS service and at a financial loss to Plaintiff.

91.     Defendants engaged in the acts of interference set forth herein with a conscious desire to induce breach of contract, or Defendants knew that breach of contract was certain or substantially certain to occur as a result of his conduct.

92.     Plaintiff has been proximately damaged and continues to be damaged as a result of Defendants' interference.

93.     There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' tortious interference.

## COUNT FOUR

### CONSPIRACY TO COMMIT FRAUD
### AND FRAUDULENT MISREPRESENTATION

94.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above and Paragraphs 105 through 112 below as though fully set forth herein.

95.     An agreement and conspiracy existed and continues to exist between and among the Defendants and their co-conspirators to unlawfully acquire in bulk, traffic, and resell unlawfully unlocked and altered MetroPCS Handsets under at least one of the MetroPCS Marks, which results in federal common law and statutory trademark infringement, common law unfair competition, contributory trademark infringement, tortious interference with business

relationships and prospective advantage, unjust enrichment, and violations of the Computer Fraud and Abuse Act, among other things.

96.     Each Defendant knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy as set forth with more particularity in this Complaint.

97.     Plaintiff has been proximately damaged by the conspiracy and Defendants' actions in furtherance thereof.

98.     There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' conspiracy.

## COUNT FIVE

### UNJUST ENRICHMENT

99.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

100.    By bulk acquisition of MetroPCS Handsets at less than the manufacturer cost of the Handsets with no intention of using the Handsets on MetroPCS service in accordance with the Terms and Conditions, and resale of MetroPCS Handsets for profit, Defendants have obtained benefits from Plaintiff that have caused significant harm to Plaintiff and resulted in significant financial gain to Defendants through their resale of the illicitly-acquired MetroPCS Handsets.

101.    Defendants have acquired the benefits voluntarily and with full knowledge of the benefits.

102.    Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying Plaintiff the value of the benefits Defendants acquired.

109288442.1

103.    There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' unjust enrichment.

## COUNT SIX

### COMMON LAW FRAUD AND FRAUDULENT MISREPRESENTATION

104.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

105.    As part of the Handset Theft and Trafficking Scheme, each Defendant, directly or indirectly through co-conspirators, regularly and systematically misrepresent to Plaintiff that the MetroPCS Handsets are being acquired for a legitimate purpose, that the Handsets will be used by Defendants or other legitimate consumers with MetroPCS service, and that they will perform in accordance with the Terms and Conditions.

106.    On information and belief, each Defendant defrauded Plaintiff to acquire MetroPCS products to be unlocked, resold, and ultimately shipped overseas for activation on foreign carrier networks.

107.    When Defendants, directly or through their co-conspirators, acquire MetroPCS Handsets as part of the Scheme, they do not intend to use the Handsets for a legitimate purpose or to activate them or maintain them as active on MetroPCS service, or otherwise perform in accordance with the Terms and Conditions.

108.    Defendants and their co-conspirators know that they are required to activate the MetroPCS Handsets for use on Plaintiff's service, pay the monthly service charge, and otherwise comply with the Terms and Conditions.

109.    Defendants intended for Plaintiff to rely on their misrepresentations, and/or the misrepresentations of their co-conspirators, to allow Defendants to acquire and unlock the Handsets for improper purposes.

110.     Plaintiff's reliance on the misrepresentations of Defendants and their co-conspirators was reasonable under the circumstances.

111.     Plaintiff has been damaged and continues to suffer damages as a result of Defendants' actions.

112.     There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' fraud.

### COUNT SEVEN

### TRAFFICKING IN COMPUTER PASSWORDS
### 18 U.S.C. § 1030(a)(6)

113.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

114.     The MetroPCS Handsets that are trafficked by Defendants are loaded with confidential codes/passwords that access: (a) Plaintiff's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Plaintiff's computer billing network (collectively, "Plaintiff's protected computer networks").  As such, the Handsets act as a gateway to Plaintiff's protected computer networks.  Plaintiff restricts access to these protected computer networks through, among other things, the confidential codes/passwords contained in the Handsets ("security codes").

115.     Through their Scheme, Defendants are knowingly trafficking in the confidential codes contained in the Handsets with the intent to defraud Plaintiff.

116.     Upon information and belief, once Defendants unlawfully acquire the MetroPCS Handsets, they or their co-conspirators use fraudulently-obtained security codes/passwords to gain additional access to Plaintiff's protected computer networks.  This additional access into Plaintiff's protected computer networks is not authorized in any way.   Upon information and belief,

Defendants or their co-conspirators share these confidential codes/passwords and methodologies for unlocking MetroPCS Handsets among themselves and with their co-conspirators.

117.    Upon information and belief, Defendants or their co-conspirators acquire the unlocking codes/passwords and methodologies for unlocking MetroPCS Handsets by misrepresenting to Plaintiff, either directly or through one of their co-conspirators, that the Handsets are being acquired and unlocked for a legitimate purpose for use by legitimate consumers with MetroPCS service, when, in fact, they are not.

118.    Upon information and belief, Defendants or their co-conspirators unlawfully access Plaintiff's protected computer networks using fraudulently-obtained confidential codes/passwords to: (1) perform various tests to confirm that the Handset they are purchasing is, in fact, active MetroPCS Handsets; and/or (2) unlock the MetroPCS Handset, which requires the manipulation and oftentimes permanent deletion of the proprietary software that is installed in MetroPCS Handsets and make unauthorized changes in Plaintiff's protected computer networks so the MetroPCS Handset will operate on other networks.

119.    Through the Handset Theft and Trafficking Scheme, Defendants and their co-conspirators are knowingly trafficking in the confidential codes/passwords contained in the Handsets with the intent to defraud and harm Plaintiff.

120.    Defendants' transfer of the Handsets and confidential codes to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029 in that the codes/passwords were transferred, or otherwise disposed of, to others, or Defendants obtained control of the codes/passwords with intent to transfer or dispose of them.

121.    Defendants' trafficking of the Handsets substantially affects interstate commerce and communication in that the codes/passwords contained in the Handsets are trafficked over the

internet, throughout the United States, and around the world, and Plaintiff's protected computer networks are used in and affect interstate commerce and communication, and provide wireless communication services pursuant to licenses issued by the Federal Communications Commission.

122.    Defendants and their co-conspirators' trafficking of illicitly-acquired codes/passwords to access Plaintiff's protected computer networks has caused and will continue to cause Plaintiff to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

123.    With respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period assessing its protected computer networks for damage and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

124.    Also with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period, investigating Defendants' intrusions into Plaintiff's protected computer networks, assessing the possible impairment to the integrity of its protected computer networks and conducting damage assessment regarding Defendants collection and dissemination of MetroPCS Handsets and security codes, as well as tracking down fraudulently sold Handsets.

125.    Moreover, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' access Plaintiff's protected computer networks without authorization.

126.    With respect to damage, by infiltrating Plaintiff's computer and telecommunications network and collecting and disseminating the illegally activated Handsets and codes/passwords, Defendants and their co-conspirators have substantially impaired the integrity of Plaintiff's protected computer networks in an amount in excess of $5,000.   Moreover,

Defendants' actions have deprived Plaintiff of the means to control the quality of its products and services.

127.    Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

128.    Defendants' conduct is intentional, malicious and willful.

129.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C. § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Plaintiff and its MetroPCS customers as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT EIGHT

### UNAUTHORIZED ACCESS
### 18 U.S.C. § 1030(a)(5)(C)

130.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

131.    The MetroPCS Handsets that are trafficked by Defendants are loaded with confidential codes/passwords that access: (a) Plaintiff's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Plaintiff's computer billing network (collectively, "Plaintiff's protected computer networks").  As such, the Handsets act as a gateway to Plaintiff's protected computer networks.  Plaintiff restricts access to these protected computer networks through, among other things, the confidential codes/passwords contained in the Handsets ("security codes").

29

132.    In general, MetroPCS Handsets are connected to and activated on Plaintiff's protected computer networks when purchased from MetroPCS.

133.    Plaintiff's proprietary computer system holds confidential information, is connected to the internet, and assists in providing federally-regulated telecommunications services.  Plaintiff's computer systems are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

134.    In furtherance of their Handset Theft and Trafficking Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire MetroPCS Handsets, including the most in-demand Smartphones, and in so doing void any purchase agreement and any legitimate access to Plaintiff's computer networks.  As such, Defendants' access to the Handsets and into Plaintiff's protected computer networks is not authorized in any way.

135.    Upon information and belief, once Defendants unlawfully acquire the MetroPCS Handsets, they or their co-conspirators use fraudulently-obtained confidential codes/passwords to gain additional access to Plaintiff's protected computer networks.  This additional access into Plaintiff's protected computer networks is not authorized in any way.

136.    Upon information and belief, Defendants acquire the unlocking codes/passwords and methodologies for unlocking MetroPCS Handsets by misrepresenting to Plaintiff, either directly or through one of his co-conspirators, that the Handsets are being acquired and unlocked for a legitimate purpose for use by legitimate consumers with MetroPCS service, when, in fact, they are not.

137.    Defendants or their co-conspirators knowingly and with the intent to defraud, cause Plaintiff to access its proprietary computer systems.  Defendants are not authorized to do so.

138.     Further, by illicitly acquiring and unlocking the Handsets, Defendants necessarily access Plaintiff's protected computer networks because the Handsets are connected to those networks when acquired from MetroPCS.

139.     Defendants acquire and, in some circumstances, unlock the Handsets by misrepresenting to Plaintiff, either directly or through a third-party agent, that the Handsets are being acquired and unlocked for a legitimate purpose and for use by legitimate consumers with MetroPCS service, when, in fact, they are not.  Defendants use fraud and misrepresentation to acquire the Handsets from MetroPCS, and, as such, Defendants' access of Plaintiff's protected computer networks is not authorized in any way.

140.     Upon information and belief, when Defendants acquire a MetroPCS Handset from Runners/Mules acting on their behalf, Defendants carefully examines the Handset to confirm it is an active MetroPCS Handset and that the various electronic code numbers and access numbers loaded on the Handset are correct.  This too constitutes unauthorized access of Plaintiff's protected computer networks via a password, contained in the Handset, obtained through fraud and misrepresentation.

141.     Further, by reselling active MetroPCS Handsets from MetroPCS dealers, Defendants are knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of Plaintiff's protected computer networks.

142.     Defendants' illegal and unauthorized access of Plaintiff's protected computer systems allows them to improperly steal Plaintiff's investment in MetroPCS Handsets.

143.     Defendants' activities substantially affect interstate commerce and communication in that, by Defendants' own admission, the Handsets are acquired and trafficked throughout the United States and around the world, and Plaintiff's computer system and

telecommunications network are used in and affect interstate commerce and communication, as well as provide wireless communication services pursuant to licenses issued by the Federal Communications Commission.

144.    Defendants' unauthorized access of Plaintiff's protected computer systems has caused and will continue to cause Plaintiff to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

145.    With respect to loss, Plaintiff has lost its investments in the illegally-acquired secure MetroPCS Handsets and spent well in excess of $5,000 investigating and assessing the possible impairment to the integrity of its protected computer systems, taking remedial action to counteract Defendants' intrusions, conducting a damage assessment regarding Defendants' collection and dissemination of MetroPCS Handsets, and tracking down fraudulently sold Handsets.

146.    Moreover, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' accessed Plaintiff's protected computer networks without authorization.

147.    With respect to damage, by infiltrating Plaintiff's computer systems and collecting and disseminating the illegally-trafficked secure Handsets, Defendants have substantially impaired the integrity of Plaintiff's systems in an amount in excess of $5,000.  Moreover, Defendants' actions have deprived Plaintiff of the means to control the quality of its products and services, and have stolen Plaintiff's financial investment in MetroPCS Handsets.

148.    Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

149.     Defendants' conduct is intentional, malicious and willful.

150.     Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C. § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Plaintiff and its MetroPCS customers as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT NINE

### UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD
### 18 U.S.C. § 1030(a)(4)

151.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

152.     The MetroPCS Handsets that are acquired by Defendants, directly and/or from their co-conspirators, in furtherance of the Handset Theft and Trafficking Scheme, are loaded with codes/passwords that access: (a) Plaintiff's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Plaintiff's computer billing network (collectively, "Plaintiff's protected computer networks").  In addition, manufacturers that produce MetroPCS wireless phones for Plaintiff install proprietary and confidential software, ordered and paid for by Plaintiff, on the MetroPCS Handsets to lock the Handsets to Plaintiff's protected computer networks and prevent the Handsets from being used other than with MetroPCS service.

153.     In general, MetroPCS Handsets are connected to and activated on Plaintiff's protected computer networks when purchased from MetroPCS.

154.     In furtherance of their Handset Theft and Trafficking Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire MetroPCS Handsets, including the most in-demand smartphones, and in so doing void any purchase agreement and any legitimate access to Plaintiff's computer networks.  As such, Defendants' access to the Handsets and into Plaintiff's protected computer networks is not authorized in any way.

155.     Upon information and belief, once Defendants unlawfully acquire the MetroPCS Handsets, they or their co-conspirators use fraudulently-obtained confidential codes/passwords to gain additional access to Plaintiff's protected computer networks.  This additional access into Plaintiff's protected computer networks is not authorized in any way.

156.     Upon information and belief, Defendants unlawfully access Plaintiff's protected computer networks using fraudulently-obtained confidential codes/passwords to: (1) perform various tests to confirm that the Handset they are purchasing is, in fact, active MetroPCS Handsets; and/or (2) unlock the MetroPCS Handset, which requires the manipulation and oftentimes permanent deletion of the proprietary software that is installed in MetroPCS Handsets and make unauthorized changes in Plaintiff's protected computer networks so the MetroPCS Handset will operate on other networks.

157.     Defendants are knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of Plaintiff's protected computer networks.

158.     Defendants' access of Plaintiff's protected computer systems allows them to improperly steal Plaintiff's substantial financial investment in MetroPCS Handsets.

159.     Plaintiff's protected computer systems are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

109288442.1

160.    Defendants' activities substantially affect interstate commerce and communication in that, by Defendants' own admission, the Handsets are acquired and trafficked throughout the United States and around the world, and Plaintiff's computer system and telecommunications network are used in and affect interstate commerce and communication, as well as provide wireless communication services pursuant to licenses issued by the Federal Communications Commission.

161.    Defendants' unauthorized access of Plaintiff's protected computer systems has caused and will continue to cause Plaintiff to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

162.    With respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period assessing its protected computer networks for damage and taking steps  to prevent future unauthorized access by Defendants and/or their co-conspirators.

163.    In addition, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period identifying the impairment of or damage to Plaintiff's protected computer networks that Defendants' and/or their co-conspirators accessed with authorization.

164.    Further, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs associated with investigating Defendants' and/or their co-conspirators' intrusions into Plaintiff's protected computer networks and taking subsequent remedial measures.

165.    Moreover, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' accessed Plaintiff's protected computer networks without authorization.

166.     With respect to damage, by infiltrating Plaintiff's computers systems and collecting and disseminating the illegally-obtained Handsets, Defendants have substantially impaired the integrity of Plaintiff's systems in an amount in excess of $5,000.   Moreover, Defendants' actions have deprived Plaintiff of the means to control the quality of MetroPCS products and services, and have stolen Plaintiff's financial investment in its Handsets.

167.     Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

168.     Defendants' conduct is intentional, fraudulent, malicious and willful.

169.     Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C. § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Plaintiff and its MetroPCS customers as a result of Defendants' conduct during any one year period aggregated is at least $5,000 in value.

## COUNT TEN

### FEDERAL TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114 [§ 32(1) of the Lanham Act]

170.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

171.     Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of certain federally-registered MetroPCS Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked, materially-different MetroPCS Handsets, which downstream customers will discover have been altered from their original state and do not include

109288442.1

the warranties, accessories, manuals and related items that constitute part of the MetroPCS Handset package.

172.    Defendants' and/or their co-conspirators' use of certain federally-registered MetroPCS Marks in connection with the sale of MetroPCS Handsets has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between Plaintiff and Defendants.

173.    Defendants' and/or their co-conspirators' unauthorized use of certain federally-registered MetroPCS Marks in connection with their participation in the Scheme is likely to continue in the future, all to the great and irreparable damage to the business, reputation and goodwill of Plaintiff.

174.    Defendants' and/or their co-conspirators' use of certain federally-registered MetroPCS Marks in connection with the unlocked, materially-different MetroPCS Handsets, which do not include warranties, manuals, accessories and related items made part of the MetroPCS Handset package, and may have been flagged as "Bad IMEI" Handsets and not able to be activated with MetroPCS service, constitutes a misappropriation of Plaintiff's distinguishing and identifying federally-registered trademarks that were created as a result of significant effort and expense by Plaintiff and its predecessor-in-interest over a long period of time.

175.    Defendants' and/or their co-conspirators' use of certain federally-registered MetroPCS Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with Plaintiff, and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Plaintiff.

37

176.     Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Plaintiff and the reputation and goodwill of Plaintiff, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of Plaintiff.

177.     Plaintiff is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

178.     Defendants' aforesaid acts constitute willful infringement of Plaintiff's aforementioned federally registered trademarks in violation of 15 U.S.C. § 1114.

## COUNT ELEVEN

### FEDERAL COMMON LAW TRADEMARK INFRINGEMENT AND FALSE ADVERTISING
### 15 U.S.C. § 1125 (a)(1)(A) and (B) [§ 43(a) of the Lanham Act]

179.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

180.     Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of at least one of the MetroPCS Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked, materially-different MetroPCS Handsets, which downstream customers will discover have been altered from their original state, are inoperable on MetroPCS service, and do not include the warranties, accessories, manuals and related items that constitute part of the MetroPCS Handset package.

181.     Defendants' and/or their co-conspirators' use of at least one of the MetroPCS Marks in connection with the sale of unlocked, materially-different MetroPCS Handsets has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source

of origin of Defendants' materially-different products, and the relationship between Plaintiff and Defendants.

182.    Defendants' and/or their co-conspirators' unauthorized use of at least one of the MetroPCS Marks is likely to continue in the future, all to the great and irreparable damage to the business, reputation, and goodwill of Plaintiff.

183.    Defendants' and/or their co-conspirators' use of at least one of the MetroPCS Marks in connection with the unlocked, materially-different MetroPCS Handsets, which do not include warranties, manuals, accessories and related items made part of the MetroPCS Handset package, and, in some cases, have been flagged as "Bad IMEI" Handsets and not able to be activated on MetroPCS service, constitutes a misappropriation of at least one of the distinguishing and identifying MetroPCS Marks that was created as a result of significant effort and expense.

184.    Defendants' and/or their co-conspirators' use of at least one of the MetroPCS Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with MetroPCS, and thus constitutes false designation of origin and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by MetroPCS.  Defendants are not affiliated with MetroPCS in any way.

185.    Defendants, in committing the foregoing acts in commerce, have damaged and will continue to damage Plaintiff and Plaintiff's reputation, and have been unjustly enriched and will continue to unjustly enrich themselves at Plaintiff's expense.

186.     Plaintiff is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

187.     Defendants' use of at least one of the MetroPCS Marks in promotion misrepresents the nature, characteristics, and/or qualities of their infringing products.  Such promotion is false and/or misleading and deceives or has the capacity to deceive consumers.  The deception and misrepresentations have a material effect on the purchasing decisions and affect interstate commerce.

188.     Defendants' activities constitute false designation of origin, false descriptions and representations, and false advertising in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B).

189.     Plaintiff is entitled to appropriate relief requested herein, including preliminary and permanent injunctive relief.

190.     Defendants knew or should have known that Plaintiff is the owner of the MetroPCS Marks and that Defendants have no legal right to use any of the MetroPCS Marks on their infringing products.

191.     Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, so as to justify the assessment of exemplary damages and an award of Plaintiff's lost profits, Defendants' profits, and Plaintiff's attorneys' fees.

## COUNT TWELVE

### CONTRIBUTORY TRADEMARK INFRINGEMENT

192.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

193.    By misappropriating and using at least one of the MetroPCS Marks in connection with the Handset Theft and Trafficking Scheme, Defendants knowingly aided and enabled distributors and/or sellers of their products to market them to members of the general public in a way that infringes at least one of the MetroPCS Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

194.    Defendants' unlawful, unauthorized, and unlicensed sale of unlocked MetroPCS Handsets has contributed to the creation of express and implied misrepresentations that the MetroPCS Handsets, as sold by Defendants, were created, authorized or approved by Plaintiff, may be activated on MetroPCS service, and include warranties.

195.    Upon information and belief, Defendants' conduct leads to post-sale confusion by causing consumers who purchase MetroPCS Handsets from Defendants or their co-conspirators to believe that they are purchasing legitimate MetroPCS handsets approved by Plaintiff that can be activated on MetroPCS service and contain original warranties.

196.    Defendants' conduct constitutes contributory infringement in violation of the Trademark Act.  Defendants' conduct is intentional, malicious and willful.

197.    Plaintiff has been damaged and continues to suffer damages as a result of Defendants' actions.

198.    There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' actions.

## COUNT THIRTEEN

### CONVERSION

199.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 63 above as though fully set forth herein.

109288442.1

200.     Defendants have and are engaged in acts of conversion in violation of the law of the State of Texas.

201.     Plaintiff has the right to provide MetroPCS Handsets and wireless service to the public.  Defendants have no such privilege or right.

202.     Defendants knew or should have known that they obtained the Handsets through illegitimate means and had no legal right to advertise, use or resell them.

203.     Defendants are wrongfully interfering with Plaintiff's rights by engaging in the Handset Theft and Trafficking Scheme.

204.     Defendants intentionally and willfully exerted dominion and ownership over the MetroPCS Handsets.

205.     Defendants' conversion of Plaintiff's property has caused and continues to cause Plaintiff to suffer irreparable injury, loss of reputation, and exemplary damages to be proved at trial.  Unless enjoined by this Court, Defendants will continue these acts, thereby causing Plaintiff further immediate and irreparable damage.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

WHEREFORE, Plaintiff respectfully requests that this Court enter final judgment and permanent injunctive relief in favor of Plaintiff and against Defendants, as follows:

(a) awarding Plaintiff its compensatory, consequential, statutory and special damages including, without limitation, its lost profits, Defendants' profits, loss of goodwill and damage to its reputation, as well as exemplary damages, together with pre and post judgment interest, as provided by law;

109288442.1

(b) awarding Plaintiff its reasonable attorneys' fees and costs associated with this

action;

(c) granting permanent injunctive relief in favor of Plaintiff and against Defendants

enjoining Defendants from engaging in the unlawful practices described in this

Complaint;

(d) requiring Defendants, pursuant to the Lanham Act, to deliver to Plaintiff its

entire inventory of phones and products bearing or infringing the MetroPCS

Marks or a confusingly similar copy thereof; and

(e) granting such further relief as this Court deems just and proper.


Respectfully submitted this 5th day of December, 2016.

By: /s/April R. Terry
April R. Terry
ATTORNEY-IN-CHARGE
Federal Bar No. 24205
SBT:  00794248
Gray Reed & McGraw, P.C.
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Phone: (469) 320-6310
Fax: (469) 320-6828
Email: aterry@grayreed.com

James B. Baldinger (*To be admitted pro hac vice*)
Florida Bar No. 869899
Email: jbaldinger@carltonfields.com
Stacey K. Sutton (*To be admitted pro hac vice*)
Florida Bar No. 289530
Email: ssutton@carltonfields.com
Alana Zorrilla-Gaston (*To be admitted pro hac vice*)
Florida Bar No. 27256
Email: agaston@carltonfields.com
Michelle Nichols DeLong (*To be admitted pro hac vice*)
Florida Bar No. 111452
Email: mdelong@carltonfields.com

43

**CARLTON FIELDS JORDEN BURT, P.A.**
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida  33401
Phone: (561) 659-7070
Fax: (561) 659-7368

*Attorneys for Plaintiff*

109288442.1